Would both attorneys, or if there's more than one, that will be presenting argument for either side, would you step up, please identify yourselves for the record. Good morning, Your Honor. Michael Pursoon on behalf of the Plaintiffs' Appellants. And would you please give me your last name again? Pursoon, P-E-R-S-O-O-N. Okay, Mr. Pursoon, thank you. Christina Hansen on behalf of the State of Illinois and the Illinois State Board of Education. All right, Ms. Hansen. Catherine Pasolpa Brown, B-K-S-U-L-P-A-N-S Brown on behalf of the Board of Education. All right, so both of you are going to present? Is that what we're doing? Yes? We've adopted most of the arguments asserted by the State to the extent we have anything to add. That's fine. All right. So I'm going to say that both sides have approximately 20 minutes total. From that, you may save some time out for rebuttal. Thank you, Your Honor. All right. So you may be seated, Mr. Pursoon. You may begin. Good morning, Your Honors. This case doesn't live in a vacuum. This case takes place in a moment in our national politics, in our national debate over democracy, disenfranchisement, and, importantly, the disillusionment of voters. Voting restrictions are falling all around us. Gerrymandering, we hope, is on the way out. Convicted felons in Florida are regaining the franchise. And a new suit challenges the winner-take-all aspect of the Electoral College for counting presidential electors. This case is part of that historical wave of suits reclaiming the right to vote, reclaiming government for the people rather than for the political class and the political elites. Your Honors, make no mistake, public schools are a fundamental part of our system of government. Justice Brennan described them as, quote, a most vital civic institution for the preservation of a democratic system of government. This is the backup of our case, our case which challenges the mayoral appointive system as both an unjustified restriction on a fundamental right and an unlawful delegation of the taxing power. Can I ask you this? What is the status of the bill that was introduced in the Illinois General Assembly? I know it passed both the House and the Senate. Was it vetoed by the governor? I don't know if it's been vetoed. It hasn't become law. And in my experience, Justice Gordon, I'm not going to hold up my lawsuits and hold my breath in waiting for the legislature to do something. I understand that. And what's the status of the companion federal case? Have oral arguments been held before that? Oral argument is set for March 28th, Your Honor. Is there a fundamental difference between the right to vote and the right to vote for an administrative body? Well, I think what to look at that, Your Honor, I'd want to talk a little bit about these line of cases, you know, there was a sailors case kind of hanging out there which we think the Supreme Court kind of modified or did away with in Hadley that originally talked about a distinction between a legislative and an administrative body and said you have the right to vote for a legislative body, but you don't have the right to vote for an administrative body. And then there was this kind of murky test as to what was a legislative or administrative body. And I think what we looked at in Hadley and what the Illinois Supreme Court looked at in cases like Fumarolo and Tully was they got rid of that legislative-administrative distinction and really said, if there is a part of the government that exercises general governmental powers, you have the right to elect it. So it's kind of a mush. They said that in Tully? Tully held that if you already had elected them, that by a statute you couldn't remove them midterm. But isn't that all Tully stands for? It doesn't say that you have to have an election for the Illinois Board of Trustees or the U of I Board. Well, how I would answer that, Your Honor, is starting with Fumarolo, in which the court stated that a school board election is an election of general interest, that's what I'm focusing on in Fumarolo for the moment. And in Tully, the court held, quote, the right to vote in an election of general interest is a fundamental right, a fundamental right. If there's an election to begin with. That says the right to vote in an election of general interest. So I think what you've segwayed me a little bit off of Justice McBride's question in focusing in on this question of if we never give you the right to vote in the first place, if we just say you guys don't get a vote, does that implicate a fundamental right? And that's what I'd like to explore by talking about Fumarolo and Tully a little bit. And I'd say we claim in this case that a strict scrutiny applies to vote dilution. And I think that's uncontested. Strict scrutiny applies to vote dilution. Let me ask you this. Is this more of a right of franchise or do you consider it just the right to vote? I don't understand the question, Your Honor. Okay. Then I'm just going to withdraw it if you don't understand. Okay. And I'm sorry. But what we're claiming is if strict scrutiny applies to vote dilution, it must apply with equal force to an outright denial to vote. And here, when you look at Illinois, the Constitution provides that the state will give us a public education system. And the state has done that through setting up 859 school districts. 858 of them, they all get to elect the school board except in Chicago. And we think that if you're going to restrict that, we view that system as a whole where it's not like there's, you know, we have a separate school code for Chicago. I know that, but it's all in one school code. But when you look at that system as a whole, that's the context in which you have to look at it. And we think that that's what the Constitution puts in place and that's what state law puts in place. Do you think that's the same thing as vote dilution? It's not the same thing as vote dilution. It's a denial of a vote. But we think that if vote dilution is subject to strict scrutiny, an outright denial of vote should also be subject to strict scrutiny or at least some intermediate scrutiny. You know, we think that Tully and Fumarolo together stand for the proposition that under Illinois law, strict scrutiny should apply. But we're open to the idea of the federal president, Bert V. Dukushin, saying there's some sort of intermediate. Is that only because there are other school districts that are elected? Or is it just generally that an appointed school board should be elected? Let's say all the other school districts in the state were also by appointment. All of them. No equal protection argument, right? Or not that kind of an equal protection argument. Would you have the same argument here? It would be a little bit different, but I would still be standing before you today, Your Honor. And that's because the school board exercises general legislative powers. But how do we get to the suspect class? Is it because other families with kids in other school systems outside of Chicago get to elect their school boards, whereas in Chicago they don't? Is that the basis of this? That's not the basis. It's not a suspect classification case. There is a race discrimination claim, an equal voting rights claim in the federal case. Okay. But this is not a suspect classification case. You're only claiming a fundamental right. Correct, Your Honor. And we believe that that fundamental right is to vote for your government bodies that exercise general legislative powers. So that would go beyond the Board of Education, then? That would go to any administrative body that was appointed that did legislative-type stuff? Yes. And if we think about some of the limits of that, if you look at how the school board operated before 1995, before 1995, and this kind of goes into the second argument about taxation, but I'm going to address it right now because I think it's pertinent. Sure. Before 1995, the school board would do lots of general legislative things. It sets policy, right? It sets the educational policy for the children of Chicago. That's a legislative thing, setting policy. It's not administrative. Administrative agencies enforce and act out policies. Legislative bodies create them, and here the Board of Education creates those. They're also taxed. But, you know, in a quirk of drafting before 1995, and consistent with the ruling in Latham from the 60s, the board would just send over what it wanted levied, and then the city council, who is directly elected, who is a legislative body, would actually stamp the levy. So, you know, if you look at that, that changes in 1995. There's no longer this stamping of the levy. The board directly taxes us. You know, I know in Illinois we love our various bodies of government. I get the pleasure of electing my mosquito abatement commissioner, for example. My mosquito abatement commissioner, very important job, I appreciate it, taxes me a lot less than the Board of Education of the city of Chicago taxes its people. But they tax you because a legislative body has given them the authority to tax within limits, right? Yes, and that goes to the RTA case, which I think may have been lurking in the background here a little bit. And I'll just slaughter the pronunciation, excuse me. But also looking at the RTA. When you look at the RTA, that's fundamentally different. The first thing that I note is it's not like there's 858 other regional transit authorities around the state that all get elected and just this one, because we're big, isn't elected. That's the first thing. The second is the RTA is fundamentally different. If you look at what the RTA does, you know, what I'm going through is preparing for argument. It looks like the legislature put in place through statute an intergovernmental agreement on how we're going to have transportation across all these bodies. And if I was defending that, let's say someone challenged that on the basis of a ruling in this case, I think the RTA would have a pretty good case under at least intermediate scrutiny that that is necessary to achieving that important interest of having a coordinated regional transit authority. It covers Chicago, Cook County, the other counties where we have this really integrated system. Does your whole deck sort of fall if the rational basis test is what we're looking at? Or would you say that you can mount that attack persuasively? I think it would be very difficult, but I think what should happen in that instance is the case should be remanded for the defendants who actually defend the basis. And if it's on a rational basis, they have a much easier case of it. But this is on a motion to dismiss where they never had to offer the justification of this. And I think it's actually difficult in looking at it to justify even under rational basis why this is necessary. And there's a couple of places that I'll start with that. The first is the classic justification is that cities greater than 500,000, and we'll just pretend that that's not just talking about Chicago, are big. They're really big. And therefore, we just have to have appointed school boards. Cases say that, but when you look at it, there's actually no justification. It's just a bold statement. Big cities have different concerns. Well, they do, don't they? What are those? I'm not sure what those concerns are. Well, I think managing a school board that's the size of what Chicago is is certainly different than managing something with 100 students or less than 1,000 or something like that. I mean, I think there is a difference. I think that Rockford has serious concerns. Peoria has serious concerns. They're large districts, too. And you can say it's different, but how are they different? And just saying that it's different I don't think gets you out of the box. Another point that I'd note, you mentioned the school board. Well, the school board doesn't do the day-to-day running of a district, right? The school board sets policy. The school board approves contracts. And what we have in Chicago is you've got the CEO. This is a classic setup in municipal corporations no less than for-profit corporations where you've got a board that has one set of functions, which is I'm going to set policies. I'm going to set the direction. I'm going to make votes on key things. Then you've got the officers who do the day-to-day stuff. Now, even if you buy into this basis that a big school district has different needs and we need a professional class of people that just could never be elected, I don't think that that cuts the mustard because we're not challenging the right to have an appointed CEO. We're going to have professional educators come in and do the day-to-day running of the school. But when it comes to the political questions of what are our legislative policies for the school district, how are we going to pay for them, what's our taxing level, things like that, I've seen no case that suggests that that can't be filled by elected as opposed to appointed officials, the setting of legislative policy. No one's saying that you can't have appointed CEOs or other people brought in who are professional educators who are going to be able to do the day-to-day running of the school. And this is raised by the state on page 31 of its brief when they try to make some of these justifications. They say variously, the logistics of running a school system this big are different. But as I just said, the board doesn't run the school system. The board sets those legislative policies, those taxing issues. The CEO runs the school system. That's what he's there for or she's there for. The state also argues around the same part of its brief that it's rational to insulate school governance from politics and to promote stable board membership. Well, I'm a little bit confused when I read that because usually what I hear in response to the argument from an elected school board is that it actually increases political accountability. We've created this laser focus on the mayor as the one person who's accountable and that if people don't like the schools, they can get rid of the mayor and that's how they get to control the school board. But now they're offering a contrary justification of we need to appoint a school board to insulate the school board from politics. And I'm not sure which it is. Isn't that the same thing? In other words, it's saying put the political accountability on the mayor who has to answer to voters in every part of the city. I'm sorry. Respectfully, I disagree, Your Honor. I think it's saying something very different. I think the idea is that the appointed members would be insulated from the politics because they would not be politically accountable. They would not be standing for election. But the mayor is politically accountable. And remember, these aren't appointments for a term. It's not like I'm setting up a member of the National Labor Relations Board who serves a term of a set number of years or a very important politically independent body, the Fed, where people are appointed because of their proficiency in the knowledge to a term. So they know within that term they're not going to be removed for political reasons and they don't have to respond to political things. But here we've got the opposite. We're saying put the laser focus of political accountability on the mayor and everyone else serves at his whim. And if he doesn't like you, you're gone. If you don't vote the way he wants you, you're gone. If you raise too much debate over a contentious issue like school closings, you're gone because the mayor is going to get what the mayor wants. So I think respectfully I disagree with that position. Can the mayor remove these members for any reason? Yes, sir. There's no cause? No cause. Yes, sir. That is part of it. Going back to your standard of how this is reviewed, either rational basis or strictly, in this Pumarolo, if I'm pronouncing it right, if you had to laser in on why the Illinois Supreme Court used strict scrutiny, and they did, correct? Yes. Why? What was the reason why they used strict scrutiny versus a rational basis? I think it was the same reason when they looked at why you had to respect the vote in the Tully case, which is they looked at the positions that issue did, and they found that they did general legislative-type functions of government. And it was looking at what are these people doing? What is their job? And that's why going back to the... Does it matter, though, that these were elected when they reviewed that particular statute, that there had been a seat change, obviously, and the council members were going to be elected? I'm sure that was involved in the background, but from our position, going back to, I think, the second question that was kind of thrown at me, I'd say that here we've got a statewide system for running the schools. And under that statewide system, the same argument applies, especially where the Board of Education of the City of Chicago fulfills these classic general governmental powers. If you think about cases from dealing with public transportation to public education, there's certain things, certain public goods that the government has always provided, and school is one of them, public school. It goes back to one of the basic things that came out of the Civil War is really when we started getting public schools in this country. Let me ask you this. This is what bothers me about what your arguments are. In 1964, in the Latham Board of Education case, you're familiar with that case? Yes, Your Honor. The Supreme Court said that the intricacies of a metropolitan school district of this magnitude require an especially high degree of competence in the members of the board. The legislature has determined that such personnel can best be obtained as board members by the appointed process and by a general city election, and is so provided. Whether or not the General Assembly has chosen the best method to accomplish an objective is a legislative and not a judicial question. Are you asking us to disregard that finding? No, Your Honor. I'd answer that in two ways. The first is that if you look at how the law has evolved since 1964, I think, in the Teller case, in 1948, in the Dethridge case. We've got Tully in 1996, Fumarolo in 1990. While we don't know for sure either of those cases, I think that they've shown a different and more nuanced understanding of the treatment of the right to vote and applying strict scrutiny to it. That would be my first answer. My second answer to your question, Your Honor, is I'm not asking this court to take up a political question and second-guess the legislature. What I'm asking this court to do is to reverse the dismissal on a motion to dismiss of this case, send it back to the district court so that we can have the defendants, if they want to defend disenfranchisement of voters in Chicago, they can come forward and offer the reasons. I don't think that the record is as clear as that statement in Latham suggests. I also think that as time goes on, it changes, and we need to know, the people of Chicago and the people of Illinois need to know, is the circumstances that justify denying them the right to vote, are they going to continue for all time, or is there some point where those circumstances go away? And that looks to our case also, which distinguishes, you know, you've got one system in the run-up to 1998, you've got another system in the run-up to 1995, and now we're in the post-1995 system. And if you recall, Your Honor, we argued in our brief that in passing the 1995 School Reform Act, it wasn't just about big cities in excess of 500,000 people. It was about dealing with an educational crisis in Chicago. That was one of the legislative purposes behind changing from this system that was in place under Mayor Harold Washington, where the school councils who were directly elected had a lot to say, to this mayoral-appointed system that we're challenging in this case, which only came into existence after 1995. And the basis for that coming into existence was an educational crisis in Chicago, not cities with only 500,000. Well, I think we need to be able to come back 23 years later and say, are we still in an educational crisis? And then more so, has this mayoral system contributed to eliminating the crisis, or has it continued to perpetuating it? Because when I look at it, I'm from Iowa, so I haven't lived through all this, but I've been in Chicago long enough, and I read the newspaper, and I've sued the Board of Education enough to know that this mayoral system, you know, it's led to fraud. It's led to corruption. It's led to people going to jail. It's not like we're living in some golden era of school administration in Chicago. And I think that remanding it and having to make that case after you instruct the circuit court as to what standard to apply, whether you think it's rationality review and you give great deference to the legislature, whether you believe it's some sort of intermediate scrutiny akin to that offered in Bode v. Takushi. Counsel, what would a remand accomplish? What kind of a hearing are you talking about? I mean, these constitutional challenges happen on motions to dismiss all the time. They don't usually hold evidentiary hearings. Well, I mean, sometimes they do. I suppose it depends on the case, but it's not at all uncommon to have a dismissal based on a 2615 or a 2619, right? But usually in those situations the government will articulate their reasons in writing. Are you saying they didn't do that below? I don't think that that record was adequately presented below, Your Honor. I think that when you look at, and this is why I focused in on the changes made in 1995, specific to Chicago and driving from an educational crisis in Chicago, that hasn't been explored. There were no opinions offered. This is all on a motion to dismiss. So no facts beyond the complaint were introduced. That's what needs to happen. But didn't the trial judge make fairly extensive findings when he dismissed this complaint? Are you saying he didn't say anything at all? Well, I think to the extent he did, I think it would have been wrong to do it in that way on the 2615 and 2619 motions to dismiss, Your Honor. Didn't he conclude that the test would have been rational basis, not strict scrutiny? And we disagree with that, and that's one of the reasons we appealed, Your Honor. All right. Largely on the basis of the combination of Fumarillo and Tully, where Fumarillo says the school board elections election general interest, and Tully says the right to vote in an election general interest is a fundamental right, which we think together equals strict scrutiny, although we're definitely open to an intermediate level of review. We're going to give you some time for rebuttal. Would you like me to answer any questions on the taxation portion or just save that for rebuttal? Why don't you save it for rebuttal, and we'll give you plenty of time to do that. Hanson? May it please the Court. Since its inception in 1872, the Chicago School Board has been appointed by the mayor of the city of Chicago. Despite that long history, plaintiffs now contend that the appointed process of Section 34-3 of the Illinois School Code deprives them of the right to vote under the Illinois Constitution and of their due process rights by allowing the appointed board to levy taxes. Both arguments fail as a matter of law. Well, would you agree that the present system isn't working? To the extent that the present system isn't working, it's still a legislative determination to address the issue. Under Article 10, Section 1 of the Illinois Constitution, it's the General Assembly that's directed to provide for the efficient system of high-quality public education. And so it's the legislative judgment that controls how schools are legislated. Don't the courts always have the say on the constitutionality of a particular piece of legislation? Sure. And the court's determination is whether the legislative act meets the requirements of the constitution. And here the challenge is that the plaintiffs have brought an equal protection and an equal and free election challenge. And those challenges fail because they're based on the false premise that there's a fundamental right to vote for members of the local school board. And that simply is not the case. The Illinois Supreme Court made clear in People Be Death-Rich and in Latham v. Board of Education for the City of Chicago that the Illinois Constitution does not create a fundamental right to vote for school board members. That right must be statutorily granted. What about your opponent's argument that the school board is really conducting what in many occasions is a legislative function? How do you respond to that? And if it's a legislative function, why isn't there a fundamental right to vote for the school board? There is no right to vote for the school board because the constitution doesn't create a fundamental right to vote for the school board. Like I said, People Be Death-Rich and Latham v. Board of Education for the City of Chicago established that there is no fundamental right to vote. And so the legislature, the General Assembly, decides whether or not to grant that right. And with respect to its largest school district, it has chosen an appointed system. And historically, Chicago has always had an appointed system. And those... Counsel, can you comment a little bit about the arguments you made below? Your opponent is suggesting you did not make an adequate record of the reasons, the rational basis, or whatever the basis. Sure. The courts have uniformly upheld the appointed system. The Latham court upheld the appointed system under rational basis review because... So did you lay out your reasons in the trial court? That's what I'm getting at. Is there a need for a remand? No, Your Honor. There's no need for a remand because as a matter of law, the legislation needs the rational basis test. The state has a legitimate interest in deciding how to legislate school districts, whether to use an appointed system, an elective system, or both. That's clear under the Latham decision. It's clear under the federal standard in sailors and the cases addressing sailors. This type of legislation has been upheld. The Sixth Circuit, for example, and mix it in more cases, upheld a very similar school structure in Detroit and in Cleveland. Courts have uniformly held that there is a rational basis for determining that a large urban school district might require an appointed school board, and the legislature should have some flexibility in considering the circumstances facing its school districts and have some flexibility to try different methods of solving the issues concerning its schools. Again, the Constitution gives to the legislature, to the General Assembly under Article 10, the power to legislate schools. I wanted to address the Fumarolo and Tully cases that the plaintiffs rely on because as they essentially concede, those cases do not overrule the court's decisions in Deathridge or Latham. Both Fumarolo and Tully involve the equal right to vote within a legislatively prescribed election process. The legislation that was an issue in those cases already involved an elective process. The issue in Fumarolo was that the elective scheme for local school councils under the 1988 Act diluted the votes of those who did not have children in attendance in the local schools for which they were voting for the local school council. The court held that a statute that changed this election process, in Tully the court held that a statute that changed the election process for the Board of Trustees of the University of Illinois from an elective to an appointed process violated the right to vote, but only insofar as that it removed duly elected officials from office before their term expired. And the reasoning for that decision was that it essentially nullified votes that had been cast for those officials. Nothing in the court's analysis of either of those cases suggests that adopting an appointive rather than an elective scheme for choosing school officials implicates the fundamental right to vote. To the contrary, in the Tully case, the court upheld the portion of the statute that changed the Board of Trustees election from an elective to an appointed process. It just said that that system could only take effect upon the expiration of the then-serving trustees' terms. Thus, those cases show that when the legislature has bestowed the right to vote, every qualified voter has the right to an equal vote, absent a compelling state interest, and that every person's vote must be permitted to serve its purpose. Neither case expands the right to vote such that it would permit a court to compel an election for school board members where the legislature has chosen an appointive scheme. And with respect to the second issue that the plaintiffs raised, Section 34.3, which provides for an appointed school board, does not violate due process by impermissibly permitting an appointed board to levy taxes. In Latham, the court recognized that the General Assembly's power to create public corporations and delegate functions, including taxation to those public corporations, is practically unlimited. And here, the board's power to levy taxes is a permissible delegation of authority. The school board limits the board's taxing power, permitting it to tax for educational purposes and setting a maximum tax cap that may be levied. It requires the board to submit any request for an increase to the voters of the district in a general or special election, and the board remains indirectly accountable to the voters through the mayor. And for those reasons, we ask that you affirm. Ms. Salter-Brown, did you wish to add some comments? The first thing I would add is that it's important to recognize, in addition to everything that's been said, there's no restriction on the legislature making distinctions between different school districts. These are different political subdivisions of the state, and there's nothing the plaintiffs cited that shows that there's any restrictions on the legislature's ability to treat districts differently. It made a decision for the reasons asserted in Latham about the large school district and the intricacies of such a body and the ability to perhaps get more knowledgeable board members through appointment as opposed to election, and it made that determination, and it's for the legislature to decide differently if that's the case. The other thing I'd point out is that the rational basis test, which has to apply to any constitutional analysis of a statute, if there's no suspect class, which is not argued here, and there's no fundamental right, which doesn't exist here, as stated in Latham and Deathridge, and I'll just quote Deathridge shortly. Its holding was, quote, no resident of a school district has an inherent right of franchise insofar as school elections are concerned. His right to vote therein is a purely permissive one bestowed by the legislative grace and further insult to the policy of the legislature, end quote. So I understand that the plaintiff believes that there's a better way to do it in Chicago, but if that better way is to come into existence, it has to be through the legislature, which is what they're considering now. All right. Thank you. Mr. Persun, rebuttal. Thank you, Erin. What I want to spend a short rebuttal on is just trying to alleviate any concerns about the comparative competency of the courts versus the legislature and make sure that's clear that we're not asking for a political solution through the courts. And what I pick up on is, you know, we're not asking the courts to second-guess the legislature, as was argued in the appellee's briefs. What we're asking for the court to do is to test the reasons the legislature gives for restricting voting rights, and there's a passage from Tully that's very important on this. Supreme Court in Tully said, quote, our cases, however, specifically state that the legislature's authority to enact any statute, including statutes governing legislatively created offices, is subject to the limitations imposed in the Constitution. One of the limits imposed in the Constitution is, of course, the fundamental right to vote. And that's why we're asking you to take a hard look at this case and to look if rationality will continue to apply to cases involving the right to vote, as was argued in Dethridge and Latham, or consistent with the more recent cases by 30 and 50 years of Tully and from the low vote, you'll apply some heightened scrutiny when looking to the reasons that the legislature has to give to take away the right to vote of the people of Chicago. And unless you have any questions, I'd end there, Your Honors. Thank you. No further questions. We would tell the parties that at some point in the future there will be a decision. The case was well argued and well briefed, and it will be taken under advisement. We're going to change panels now for the next case.